# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                              Crim. No. 17-0353 MV

CRYSTAL MURO-JIMENEZ,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant Crystal Muro-Jimenez's Motion to Suppress Evidence, filed March 7, 2018 [Doc. 22]. The Court held an evidentiary hearing on July 25, 2018. Having reviewed the briefs, testimony, exhibits, and relevant law, for the reasons below, the Court denies the Motion.

## BACKGROUND

This case concerns the interdiction of drugs at the Greyhound bus station in Albuquerque, New Mexico. The following represents the Court's findings of fact, based on the audio recordings and photographic evidence submitted, as well as witness testimony.[1]

On October 20, 2016, Crystal Muro-Jimenez had traveled from Glendale, Arizona, to Albuquerque by Greyhound bus. The bus began its journey in California and made numerous

---

[1] When ruling on a motion to suppress, the Court must state its essential findings on the record. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for Rule 12(d)'s purposes. The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search. *See United States v. Merritt,* 695 F.2d 1263, 1269–70 (10th Cir. 1982) ("[U]nder Rule[ ] 104(a) ..., the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'") (quoting *United States v. Matlock,* 415 U.S. 164, 174 (1974)). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. *See* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege.").

stops, including in Glendale. The bus was scheduled to arrive in Albuquerque at 9:35 p.m. and, presumably, arrived on time. When the bus arrived at the terminal, Ms. Muro-Jimenez exited the bus along with the rest of the passengers in order for the bus to be cleaned. Shortly before 10:45 p.m., Ms. Muro-Jimenez and other passengers re-boarded the bus to continue their journeys. When they re-boarded the bus, Drug Enforcement Agency (DEA) Special Agent (SA) Jerrell Perry was standing in the back of the bus.

SA Perry has been employed with the DEA for nearly twenty years. He specializes in intercepting the movement of drugs and proceeds from illegal narcotics on means of public transportation, such as buses and trains. SA Perry is particularly familiar with the travel routes of the Greyhound buses that pass through Albuquerque. On October 20, 2016, SA Perry was at the bus station waiting for the eastbound bus to arrive at 9:35 p.m.

The Court had the benefit of listening to the audio recordings made by the recording device worn by SA Perry [Exs. 1, 4]. The recording in Exhibit 1 and SA Perry's testimony indicate that he stood at the back of the bus and began questioning passengers, starting at the back of the bus and working his way forward. He informed the passengers that he was a police officer there for security purposes, and would ask a few questions regarding their travel and what luggage they had. He asked some passengers for their ticket and identification. He commented to one passenger that the bus was "pretty full," suggesting that there were at least a couple dozen people on the bus. [Unoff. Tr.[2] at 57:20-59:24]. The first man he spoke with started to get up when SA Perry introduced himself, and SA Perry told him he did not have to leave his seat. The second passenger SA Perry spoke with said he had met SA Perry before, on a previous bus trip. The third passenger SA Perry spoke with did not seem to understand English, so SA Perry

---

[2] Citations to hearing testimony pertain to an unofficial transcript of the evidentiary hearing that took place on July 25, 2018. Transcripts of Exhibits 1 and 4, the audio recordings of the encounter, were not provided to the Court.

2

switched to rudimentary Spanish. In total, SA Perry spoke with four other passengers or parties of passengers before getting to Ms. Muro-Jimenez. His conversations with these four parties were brief, lasting a total of almost five minutes, and he only searched the bag of the first passenger.

When SA Perry approached Ms. Muro-Jimenez, he told her that he was a police officer and asked for permission to speak with her. In response, Ms. Muro-Jimenez stood up and started to move away from her seat. Similar to his interaction with the first passenger, SA Perry told her she did not have to stand up and could sit down if she liked. She sat back down. He then began to ask her for her bus ticket. Her ticket bore the name Vanessa Hernandez, to which Ms. Muro-Jimenez said "No, it's Jimenez," quickly offering to show him her identification. She provided him with her identification and said she did not know why her ticket had the wrong last name. At the evidentiary hearing, SA Perry testified that her traveling under a false name was one reason he suspected that she could be carrying contraband. [Unoff. Tr. at 21:11-12]. SA Perry asked where her trip began (Glendale, Arizona), her final destination (Kansas City), and the purpose of her trip (to visit her sister).

When SA Perry tried to ask her about luggage, Ms. Muro-Jimenez did not respond. She looked down at the floor. SA Perry asked a second time, and again she did not respond. He then asked if she understood English and switched to Spanish. Ms. Muro-Jimenez turned over the blanket and pink backpack that she had with her at her seat to be searched. She denied having any other luggage. When SA Perry searched the pink backpack, he noted that although there was no contraband in the backpack, he did not think the backpack was the only luggage she had because there were no toiletries and hardly any clothes in the backpack. [Unoff. Tr. at 21:21-25].

3

He asked her how long she planned to be in Kansas and how many times she had been there before.

Immediately after speaking with Ms. Muro-Jimenez, SA Perry saw the green and black duffle bag in the overhead bin. He noted that the bag looked new and did not have a name tag, so he asked a party of men, in English, if the bag belonged to them. [Unoff. Tr. at 16:8-15]. They denied ownership of the bag. SA Perry then continued to ask to speak with two more passengers or parties of passengers. He spoke to two women, each of whom spoke Spanish. Then, SA Perry returned to the green and black duffle bag. He had been talking to passengers for a total of around 11 and a half minutes thus far, and had consensual encounters with only 7 passengers or parties of passengers. However, he removed the bag from the overhead bin and showed it to 29 passengers, asking whose bag it was. The recording suggests that he asked each person once "is this your bag?" He asked some people in English and others in Spanish. However, when he came to Ms. Muro-Jimenez, who was the ninth person he asked about the bag, he asked her several questions about the bag, to which she either faintly said no or shook her head:

> SA Perry: Ma'am is this your bag? Do you know who it belongs to? Do you have anything inside of it that does belong to you? Do you care what happens to it? Do you have any interest in it?

Having asked 29 passengers whether the duffle bag belonged to them[3], Perry took the duffle bag off the bus, stepped in front of the bus where he would not been seen by passengers, unzipped the bag, and immediately began examining the contents. He found two clear plastic bundles that he suspected contained illegal narcotics. He then re-boarded the bus and asked Ms.

---

[3] After SA Perry asked Ms. Muro-Jimenez questions about the duffle bag, and while he was continuing to question other passengers, a passenger can be heard on the recording commenting sarcastically "[s]omebody gonna tell you that's their bag?"

4

Muro-Jimenez to speak with him outside the bus.[4] Ms. Muro-Jimenez did not say anything and walked off the bus.

Once off the bus, SA Perry asked to see her identification again and to step to the side. He confirmed her address and then asked her about two dozen questions over the course of about eight minutes. SA Perry asked Ms. Muro-Jimenez when she bought her ticket, whether anyone gave her the duffle bag to transport, why her name was listed incorrectly on her ticket, where she boarded the bus, her sister's name, when she decided to go on the trip to Kansas, how long she was staying in Kansas, whether her ticket was one way or round trip, her sister's phone number, whether her sister was older or younger, who she lives with in Phoenix, her mother's name and phone number, what clothes did she intend to wear on her trip. Then SA Perry asked her for permission to do a pat-down search and to search her pink backpack again. She consented to both. He then asked if she worked, the purpose of some good luck stones in her backpack, how she got from her home to the bus station, and what kind of car her sister drove. SA Perry then took pictures of Ms. Muro-Jimenez, confirmed her address yet again, and asked again to see her blanket and backpack. This conversation lasted almost ten minutes until the driver said that it was time for the bus to depart. SA Perry quickly took more pictures of Ms. Muro-Jimenez, told her she was free to go, and Ms. Muro-Jimenez reboarded the bus as it departed.

SA Perry then subpoenaed surveillance footage from the Glendale, Arizona, Greyhound station, which showed Ms. Muro-Jimenez carrying the green and black duffle bag along with her pink backpack and blanket when she boarded the bus.[5] The bundles were determined to contain

---

[4] This is the beginning of a new audio recording, [Ex. 4].
[5] There is a date stamp on the surveillance video from the Glendale bus station indicating that the video was recorded on October 19, 2016. However, SA Perry testified that the bus would have left Glendale, Arizona, on October 20, 2016. Given that the surveillance video shows Ms. Muro-Jimenez at the bus station, carrying the pink backpack and the green and black duffle bag, [Exs. 11-13], and given the defense's stipulation that the surveillance "establish[es] that Ms. Muro was in possession of the black duffle bag when she left Arizona," [Doc. 37 at 4], the Court finds that Ms. Muro-Jimenez boarded the bus in Glendale, Arizona, with the green and black duffle bag.

5

2.49 kg methamphetamine actual. The substance had a purity of 98%. Ms. Muro-Jimenez was indicted months later and arrested in Phoenix.

At the evidentiary hearing, SA Perry gave testimony about how he conducts encounters generally and, after counsel for the government played portions of the audio recordings, how the encounter unfolded in this case. He testified as to the factors that led him to believe that Ms. Muro-Jimenez was the one transporting the duffle bag: the fact that her bus ticket and identification did not match; the fact that the bag was located directly across from her in the overhead bin; the fact that, after looking towards him while answering questions, Ms. Muro-Jimenez fell silent and looked down at the floor when SA Perry asked her if she had any luggage with her; and his perception that her backpack did not seem to be packed with the clothes and toiletries she would need on her trip. [Unoff. Tr. at 21:11-22:2].

The Court notes that, as defense counsel has pointed out [Doc. 37 at 10 n.4], SA Perry's recollection of events at the evidentiary hearing was fairly one-sided. He testified to remembering details about the encounter in response to the government's questions, including (1) that Ms. Muro-Jimenez had her bus ticket in her hand when he began speaking with her [Unoff. Tr. at 11:15]; and (2) that Ms. Muro-Jimenez did not seem intimidated by him [*id.* at 23:19]. However, he testified that he was unable to recall facts in order to answer virtually any of the defense's questions on cross examination, including (1) whether he spoke to all of the passengers on the bus [*id.* at 39:17]; (2) whether he followed his generally standard procedure of watching the bus coming in, watching the passengers deboard, looking at the luggage underneath the bus and in the passenger area of the bus, and speaking with passengers as they reboard and resume their seats on the bus [*id.* at 40:17-41:3]; and (3) how full the bus was [*id.* at 57:20-59:24].

The Court asked SA Perry to account for these discrepancies, and in response to the Court's questioning, SA Perry claimed to remember that no other passengers boarded the bus after he had walked the bag up and down the aisle. [*Id.* at 90:10-91:8]. Therefore, on the issue of whether he spoke to all passengers before searching the duffle bag, SA Perry's testimony in response to the Court's questioning was inconsistent with his testimony in response to defense counsel. The Court therefore gives limited weight to SA Perry's testimony recalling specific details of the encounter, and relies significantly on the audio recordings. The Exhibit 4 audio recording does not indicate that any additional passengers returned to the bus while SA Perry was speaking with Ms. Muro-Jimenez outside the bus, and the bus departed immediately after the encounter ended. SA Perry acknowledged during cross examination that most Greyhound buses seat about 55 people, [Unoff. Tr. at 58:19], and he commented in the Exhibit 1 recording that the bus was "pretty full." Because the recording indicates that the bus was "pretty full" and he asked 29 passengers to claim the bag, the Court is persuaded that in asking 29 people whether the duffle bag was theirs, SA Perry had questioned everyone on the bus and no one claimed the bag.

**PROCEDURAL BACKGROUND**

On February 7, 2017, Ms. Muro-Jimenez was charged in a one-count Indictment [Doc. 1] with Possession with Intent to Distribute 500 Grams and More of a Mixture and Substance Containing Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). On March 7, 2017, she filed the instant Motion to Suppress [Doc. 22], arguing that her consent to the search was involuntary and coerced. On March 21, 2018, the United States filed a Response in opposition to Ms. Muro-Jimenez's Motion to Suppress. [Doc. 24]. On April 18, 2018, Ms. Muro-Jimenez filed a Reply to the United States' Response. [Doc. 26]. The Court held an

evidentiary hearing on July 25, 2018, and took the Motion under advisement. SA Perry testified at the hearing.

**STANDARD**

The Fourth Amendment protects "the right of the people to be secure in their . . . effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search implicating the Fourth Amendment occurs when the government invades a person's "legitimate expectation of privacy." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). A search undertaken without a warrant, subject only to a few, well-established exceptions, is *per se* unreasonable under the Fourth Amendment. A seizure implicating the Fourth Amendment occurs when the government meaningfully interferes with an individual's possessory interests in their property. *See, e.g., U.S. v. Jacobsen*, 466 U.S. 109, 113 (1984). When a defendant moves to suppress evidence obtained as a result of an allegedly unconstitutional search, he has the burden of demonstrating a subjective expectation of privacy that society is prepared to recognize as reasonable. *See United States v. Conway*, 73 F.3d 975, 979 (10th Cir. 1995).

Tenth Circuit law is clear that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *United States v. Lopez,* 443 F.3d 1280, 1283 (10th Cir. 2006) (quoting *Florida v. Bostick,* 501 U.S. 429, 434 (1991)) (internal quotation marks omitted). In *U.S. v. Jones*, 701 F.3d 1300, 1313 (10th Cir. 2012), the Court summarizes the following:

> [A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [ ]he was not free to leave." *United States v. Fox,* 600 F.3d 1253, 1258 (10th Cir. 2010) (first alteration in original) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554 (1980)) (internal quotation marks omitted); *see, e.g., United States v. Salas–Garcia,* 698 F.3d 1242, 1248 (10th Cir. 2012) ("A seizure occurs when 'a reasonable person would not feel free to leave or disregard the contact.'" (quoting *Lundstrom v. Romero,* 616

F.3d 1108, 1119 (10th Cir. 2010))). "The critical inquiry is whether the police conduct would have communicated to a reasonable person that [ ]he was not at liberty to ignore the police presence and go about [his] business." *Fox,* 600 F.3d at 1258 (quoting *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382, 115 L.Ed.2d 389) (internal quotation marks omitted).

*See also United States v. Bostick*, 501 U.S. 429, 437 (1991) ("no seizure occurs when police ask questions of an individual, ask to examine the individual's identification, and request consent to search his or her luggage—so long as the officers do not convey a message that compliance with their requests is required."). The government bears "the burden of proving that consent is given freely and voluntarily." *Jones,* 701 F.3d at 1318 (citation omitted).

"Further, the question whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Id.* (citation omitted). The *Bostick* Court deemed the following factors relevant to the Fourth Amendment reasonableness determination: (1) whether the agent advised the defendant he had the right to refuse consent, (2) whether the agent in any way threatened the defendant (*i.e.,* the display of a weapon and/or the nature of the questioning), and (3) the particular location of the encounter. *Bostick*, 501 U.S. at 437. Following *Bostick,* the Tenth Circuit similarly identified various factors relevant to whether a reasonable person would not feel free to terminate an encounter with police:

> The threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

*United States v. Hill,* 199 F.3d 1143, 1147–48 (10th Cir. 1999). The factors listed in *Hill* are not exhaustive. *See United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017); *Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005). Courts "'must consider all the circumstances

9

surrounding the encounter' to determine whether consent was voluntary." *U.S. v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (quoting *Bostick*, 501 U.S. at 439). "A defendant's subjective state of mind may be relevant to some degree on the issue of the voluntariness of his or her consent, but it is not determinative if it does not overcome other indicia that the defendant's consent was freely and voluntarily given." *U.S. v. Huerta-Rodriguez*, 2010 WL 4929044, at *10 (D.N.M. Oct. 20, 2010) (Browning, J.) (citing *Hill*).

In general, a warrantless search and seizure of abandoned property is not unreasonable under the Fourth Amendment. *U.S. v. Trimble*, 986 F.2d 394, 399 (10th Cir.), *cert. denied*, 508 U.S. 965 (1993). However, the abandonment must be voluntary. *U.S. v. Ward*, 961 F.2d 1526, 1535 (10th Cir. 1992), *overruled on other grounds in U.S. v. Little*, 18 F.3d 1499, 1504 (10th Cir. 1994). Mere "police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary," *U.S. v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983), but property is considered involuntarily abandoned if the abandonment was a consequence of illegal police conduct. *See, e.g., U.S. v. Garzon*, 119 F.3d 1446, 1450–51 (10th Cir. 1997) (finding property not abandoned when left on bus after police issued unlawful order to remove all belongings from bus and "parade them past a drug-sniffing dog"); *U.S. v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993) ("An abandonment is not voluntary when it results from a Fourth Amendment violation.").

A bus passenger who fails to claim a bag may not have abandoned the bag. For example, in *U.S. v. Cuevas-Ceja*, 58 F. Supp. 2d 1175 (D. Or. 1999), the passenger had been told by officers that she was not required to consent to their requests to search, so the court held that her failure to claim a bag when directed to do so was not necessarily abandonment—she was also declining consent to the officers' request and therefore had standing to challenge the seizure of the bag. Similarly, in *Garzon*, the Tenth Circuit held that the officer's request of the passengers

was unlawful and that the defendant's refusal to comply with that demand, especially in the absence of any facts indicating an objective intent to abandon the bag, did not amount to abandonment. 119 F.3d at 1450-51. However, some courts disagree and do not require evidence of an objective intent to abandon a bag; in other words, silence when asked to claim the bag is enough to constitute abandonment. *See, e.g.*, *U.S. v. Fulani*, 368 F.3d 351 (3d Cir. 2004); *but see the district court's opinion in U.S. v. Fulani*, 277 F. Supp. 21 454 (M.D. Pa. 2003) (finding that the defendant's silence was consistent with refusal to cooperate and not abandonment, especially since the bag had a luggage tag with the defendant's name on it).

## DISCUSSION

In considering the totality of the circumstances, the Court finds that Ms. Muro-Jimenez voluntarily consented to answer SA Perry's questions on the bus. The Court further finds that because SA Perry did not unreasonably seize the duffle bag, Ms. Muro-Jimenez's abandonment of the bag was voluntary. Accordingly, the duffle bag was not searched in violation of the Fourth Amendment and the methamphetamine shall not be suppressed.

The factors under *Hill,* 199 F.3d at 1147–48, weigh in favor finding that Ms. Muro-Jimenez's interactions with SA Perry on the bus, including her failure to claim the duffle bag, were voluntary. SA Perry was unaccompanied by other officers, he was in plain clothes and not displaying a weapon, he did not touch her, he spoke with her in front of the other passengers, his tone was unaggressive, and he searched her personal belongings quickly and returned them to her immediately. Although their conversation aboard the bus took place in a closed space, and although Ms. Muro-Jimenez may have been intimidated when, at the outset of the conversation, she stood up in her seat, SA Perry attempted to alleviate any tension by telling her she could sit down and by moving out of the way as needed for other passengers to get by. *See, Bostick*, 501

U.S. at 439 (finding that the location of an encounter in the cramped confines of a bus is one relevant factor in evaluating whether the passenger's consent was voluntary, but is not determinative); *United States v. Broomfield*, 201 F.3d 1270, 1274-75 (10th Cir. 2000) (finding that agent conducting consensual encounters starting at the back of the bus left a "clear path" for passengers to exit the bus, weighing against finding coercion, and noting that the defendant's "freedom of movement was the natural result of his choice of transportation and seat assignment, not the result of [the agent's] conduct"). Once she sat back down, Ms. Muro-Jimenez answered SA Perry's questions without hesitation until he asked whether she had any luggage. Under these circumstances, the Court finds that a reasonable person would have felt free to decline to answer SA Perry's questions.

Regarding SA Perry's handling of the duffle bag, courts have held that a brief detention of checked baggage does not amount to a seizure when the bag is not delayed from reaching the intended destination, because "a passenger gives up his immediate possessory interest when he checks his bags with the commercial carrier as a bailee." *United States v. Va Lerie*, 424 F.3d 694, 703-07 (8th Cir. 2005) (en banc). However, the Tenth Circuit has looked more critically at detention of a carry-on bag, explaining that "a traveler's possessory interest in his luggage is at its zenith when the luggage is in his direct possession and is at its nadir when the luggage has been checked with a common carrier." *United States v. Hill*, 805 F.3d 935, 938 (10th Cir. 2015). In *Hill*, DEA Agent Kevin Small boarded an Amtrak train during its regularly scheduled stop in Albuquerque, went to the common luggage area where passengers had stowed their unchecked luggage, and noticed a bag without a name tag. *Id*. at 935. He removed the bag from the luggage racks, brought it to the passenger area, rolled it down the center aisle and asked each passenger if the bag belonged to them. All passengers denied ownership, Agent Small deemed

the bag abandoned, and upon searching the bag discovered a large quantity of cocaine and items connecting the bag to the defendant. The district court denied suppression and held that the bag had been voluntarily abandoned. However, the Tenth Circuit held that Agent Small's actions were "entirely at odds with the expectations of a reasonable traveler" and amounted to an unreasonable seizure. *Id*. at 938-39. The Court noted that the government had waived the argument that Agent Small's seizure of the bag, before he showed it to passengers, was based on reasonable suspicion. *Id*. at 939.

Here, SA Perry similarly removed the duffle bag from the overhead bins and walked it up and down the center aisle of the bus, asking passengers if the bag was theirs. However, before he removed the bag from the overhead bin, SA Perry had reasonable suspicion that the duffle bag contained contraband. SA Perry had not only noted that the bag did not have a name tag, but he had also been questioning the passengers sitting near the bag as to whether they had any luggage, and no one had claimed the bag. Agent Small merely noted that the suitcase did not bear a name tag, and the government had waived the argument that he had reasonable suspicion for removing the bag. *Hill*, 805 F.3d at 939. In contrast to a carry-on luggage compartment at the end of a train car, the overhead bin in a bus allows passengers to stow carry-on luggage near their seat, and before removing the duffle bag, SA Perry had already determined that the individuals seated near the duffle bag did not claim the bag. Because SA Perry had reasonable suspicion that the bag contained contraband, his actions of removing the bag from the overhead bin and asking passengers to claim it did not amount to an unreasonable seizure. *See id.* at 938-39. Accordingly, because her abandonment of the bag was not the result of unlawful police conduct, Ms. Muro-Jimenez's abandonment of the bag was voluntary. *Hernandez*, 7 F.3d at 947.

Defense counsel is right to point out that, after searching the duffle bag and discovering the plastic-wrapped bundles suspected of containing illegal drugs, SA Perry's questioning of Ms. Muro-Jimenez off the bus was very targeted and extensive. He spoke with her for approximately ten minutes and asked her very detailed questions about her trip and contact information for her family members. He obtained her consent to do a pat down search, and he took photographs of her and her belongings. Although Ms. Muro-Jimenez remained cooperative throughout the encounter, the Court notes that the encounter may have shifted from consensual to coercive. However, in moving to suppress the methamphetamine found in the duffle bag as a result of Ms. Muro-Jimenez's abandonment of the bag while aboard the bus, the Court is not asked to rule on the constitutionality of the encounter off the bus, after the duffle bag had been lawfully searched.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** Ms. Muro-Jimenez's Motion to Suppress [Doc. 22] in its entirety.

Dated this 25th day of September, 2018.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE

Brian A. Pori  
Assistant Federal Public Defender  
*Attorney for Ms. Muro-Jimenez*

Letitia Carroll Simms  
Assistant United States Attorney  
*Attorney for the United States*